**WO**                                                                                                         SM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Earnest Austin, Jr., | No. CV-23-00657-PHX-MTL (JFM) |
| Plaintiff, | |
| v. | **ORDER** |
| Karanja Adams, et al., | |
| Defendants. | |

Plaintiff Earnest Austin, Jr., who is currently confined in Arizona State Prison Complex-Florence, Cook Unit in Florence, Arizona, brought this civil rights case pursuant to 42 U.S.C. § 1983. (Doc. 1.) Plaintiff asserts three claims for relief under the Eighth Amendment for inadequate medical care. (Doc. 1, 39.) Defendants move for summary judgment (Doc. 57), and Plaintiff did not respond.[1] The Court will grant the Motion for Summary Judgment and terminate the action.

**I.    Background**

On screening Plaintiff's Complaint (Doc. 1) under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment medical care claims against Nurse Practitioner ("NP") Karanja Adams, Dr. Rodney Stewart, Arizona Department of Corrections ("ADC") Director Ryan Thornell, and private healthcare contractor NaphCare Inc. and directed these Defendants to answer. (Doc. 5.)

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response. (Doc. 59.)

Defendants now move for summary judgment on the grounds that Plaintiff received proper medical care and their conduct did not amount to deliberate indifference. (Doc. 57.)

II. **Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

. . . .

**III.     Relevant Facts**[2]

NaphCare took over as ADC's contracted healthcare provider on October 1, 2022. (Doc. 15-1, Adams Decl. ¶ 3.) In October 2022, NP Siji Thomas diagnosed Plaintiff with an arterial blockage in his heart, and NP Thomas advised Plaintiff that she would request a consult with a cardiologist. (Doc. 1 at 3.)

In November 2022, "Plaintiff asked medical staff if he was approved to see a[] cardiologist for his heart condition, and Plaintiff was told that its [sic] up to [Defendant Dr. Stewart]." (*Id.* at 8.) On November 30, 2022, Plaintiff sent an Inmate Letter to Defendant Dr. Stewart asking Defendant Stewart to come see Plaintiff "about his medical condition." (*Id.*) Plaintiff did not receive a response. (*Id.*)

By December 5, 2022, Plaintiff had not been taken to the cardiologist, so he submitted a Health Needs Request ("HNR") inquiring about the status of his cardiology appointment and requesting an emergency cardiology visit. (*Id.* at 3, 8.) On December 19, 2022, Plaintiff submitted "an HNR requesting a[n] emergency visit to the cardiologist because he was suffering chest pain and shortness of breath[.]" (*Id.* at 8.) Plaintiff did not receive a response to his HNRs, so on January 10, 2023, he submitted another HNR requesting an appointment to discuss his chest pain, shortness of breath, dizziness, fainting, light-headedness, confusion, blurred vision, heart palpitations, and extreme fatigue. (*Id.* at 3.) At some point, Plaintiff was informed "that Dr. Stewart . . . was looking into Plaintiff's medical records." (*Id.* at 8.) The "medical staff told Plaintiff that Dr. Stewart [said] that nothing can be done until Plaintiff get[s] about 65% or more bl[o]ckages in his heart before he would be able to sign off o[n] Plaintiff being taken to a cardiologist for treatment" per NaphCare policy. (*Id.* at 9.)

On January 14, 2023, Plaintiff had a chronic care appointment with NP Avant-Ortiz

---

[2] Because Plaintiff did not file a response or controverting statement of facts, the Court will consider Defendants' facts undisputed unless they are clearly controverted by Plaintiff's first-hand allegations in the verified Complaint or other evidence on the record. Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

regarding his chest pain, palpitations, and shortness of breath. (Doc. 15-1 ¶ 5.) Plaintiff was given an EKG, which indicated an abnormal heartbeat. (*Id.*) Because Plaintiff had an abnormal EKG, a repeat EKG was ordered, and a cardiology consult request was also submitted. (*Id.*)

On January 25, 2023, Plaintiff was seen by Defendant NP Adams, and Plaintiff underwent a follow-up EKG evaluation. (Doc. 1 at 3.) Defendant Adams informed Plaintiff that the results of the EKG evaluation indicated a blockage in his heart arteries, but the blockages were not "serious enough to warrant a trip to see the cardiologist." (*Id.*) Defendant Adams told Plaintiff that he only had a 10% blockage, and under NaphCare policy, "in order for her to justify requesting outside treatment for his heart . . . Plaintiff['s] EKG would have to show a 65% blockage[], where a surgeon would clear out the blockages in his heart." (*Id.* at 4.) Plaintiff asked Defendant Adams about his risk of heart attack, "[a]nd NP Adam[s] said that's a possibility [and] that she would monitor his condition and if it got any wo[rse], then she would consider making a recommendation for Plaintiff to see a cardiologist." (*Id.*)

On February 27, 2023, Plaintiff was seen by a cardiologist because of his abnormal EKG and prior diagnosis of a right bundle branch block ("RBBB").[3] (Doc. 58, Defs.' Statement of Facts (DSOF) ¶ 12; Doc. 51-1 ¶ 6.) The cardiologist noted that Plaintiff reported occasional, short-lived palpitations, but no acute chest pain, pressure, or other cardiac symptoms. (*Id.*) The cardiologist determined that Plaintiff had no cardiac risk factors or any other cardiac symptoms besides the abnormal EKG. (DSOF ¶ 12; Doc. 15-1 ¶ 6; Doc. 15-2 at 4.) Plaintiff informed the cardiologist that he was able to exercise in the yard without any problems, so the cardiologist advised Plaintiff that he was not worried about the RBBB pattern and that it was probably congenital. (*Id.*) The cardiologist determined that no further cardiac work-up was necessary and recommended smoking

---

[3] A bundle branch block refers to a delay or blockage along the pathway that electrical impulses travel to make the heartbeat. This makes it harder for the heart to pump blood to the rest of the body. *See* "Bundle branch block." Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/bundle-branch-block/symptoms-causes/syc-20370514 [permalink: https://perma.cc/U5E4-ASP9].

cessation and to return if Plaintiff became symptomatic. (*Id.*)

In March 2023, NP Adams issued Plaintiff a Special Needs Order ("SNO") for a bottom bunk "because NP Adams did not want Plaintiff to climb up and down on the bunks due to his heart condition . . . to keep Plaintiff from having a heart attack." (Doc. 1 at 4.)

On or about March 7, 2023, Plaintiff was informed "that Dr. Stewart told [the medical staff] to tell Plaintiff that nothing can be done until Plaintiff get[s] about 65% or more blockages in his heart before [Dr. Stewart] would be able to sign off o[n] Plaintiff being taken to a cardiologist" according to NaphCare policy. (Doc. 1 at 8–9.)

Notwithstanding the cardiologist's evaluation and assessment in February, from March 10 through March 24, 2023, Plaintiff submitted more HNRs regarding his heart-related symptoms, but he did not receive responses to these HNRs. (Doc. 1 at 4.)

Plaintiff continued to file HNRs in April 2023 regarding the lack of treatment for his heart condition. (Doc. 1 at 4–5.) On April 11, 2023, Plaintiff complained to Deputy Warden ("DW") Henry that he was not receiving any treatment for his heart condition, and DW Henry told Plaintiff "that there was nothing that he could do to help Plaintiff, but to follow medical staff instructions." (*Id.* at 5.) Cook Unit medical staff told Plaintiff "that if he continue[d] to complain[] that he would lose his job"; shortly after Plaintiff complained about not getting medical treatment for his heart, he lost his job. (*Id.*)

On April 13, 2023, Plaintiff was moved to another building and was assigned to a top bunk. (Doc. 1 at 5.) Plaintiff was advised that Defendant Adams had informed the medical staff that Plaintiff's bottom bunk SNO expired and that she was not going to renew it because of Plaintiff's "excessive complain[]ing about his heart condition." (*Id.* at 6.)

Later that night, while he was climbing up to the top bunk, Plaintiff states that he "suffered a mild heart attack and lost consciousness," and he fell and hit his head on the concrete floor. (Doc. 1 at 6.) Plaintiff was transported to the hospital, "and the doctors [at the hospital] wanted to treat Plaintiff['s] heart blockage [but] . . . Dr. Stewart would not approve the treatment and Plaintiff was sent back to Cook Unit." (*Id.*) Plaintiff's records show Plaintiff told the emergency room providers that "his knee gave out." (Doc. 15-2 at

19, 30).  The hospital records from that day show a normal CT scan and that Plaintiff did not report losing consciousness and did not report any cardiac-related symptoms.  (*See id.* at 30–33.)  There was no indication that Plaintiff suffered a heart attack.  (*See id.*)  The emergency room treating physicians noted that Plaintiff had "no chest pain or shortness of breath."  (*Id.* at 32).  Plaintiff was prescribed pain medication and returned to the prison.  (*Id.* at 34–35).

After Plaintiff returned from the hospital, he was seen by Defendant Adams, and she told Plaintiff that she was not going to renew his bottom bunk SNO.  (Doc. 1 at 6.)  Based on her examination of Plaintiff, Defendant Adams did not believe that Plaintiff's medical condition necessitated a bottom bunk.  (Doc. 15-1 ¶ 12.)  Defendant Adams' observations of Plaintiff were that he engaged in physical activities when performing his job duties in the medical unit and that he admitted to the cardiologist that he was able to exercise in the yard, and Defendant Adams' review of other relevant, current medical records led her to the conclusion that Plaintiff did not need a lower bunk SNO despite the purported falls.  (DSOF ¶ 21.)

The next day, April 14, 2023, Plaintiff was trying to get into his top bunk, and he asserts that he suffered another mild heart attack and fell from his bunk.  (Doc. 1 at 7.)  He was taken to the hospital again to be treated for injuries "to his head, back, legs, feet, face, neck, chest," and left knee from hitting the concrete floor when he fell.  (*Id.*)  Plaintiff did not complain of any cardiac symptoms precipitating the fall, indicated that he had not lost consciousness, and emergency room treating physicians again noted that Plaintiff had "no chest pain or shortness of breath."  (Doc. 15-2 at 39, 42, 48).  The hospital records do not indicate that Plaintiff suffered a heart attack.  (*See id.* at 38–42.)  A physical examination was completed, and Plaintiff's heart was noted as having regular rate and rhythm.  (*Id.* at 41.)  It was noted that Plaintiff had a small hematoma on his forehead, but no serious injuries or follow-up concerns were noted.  (*See id.* at 40, 42.)  Plaintiff was given another CT scan to check for any spinal or head injuries, prescribed pain medication, and returned to the prison.  (*Id.* at 43–44).

That same day, NP Forehand saw Plaintiff, and Forehand told Plaintiff that he did not qualify for a lower bunk and that his complaints of some ongoing back pain had been previously addressed by imaging; Plaintiff advised that his low back pain was addressed by Ibuprofen. (DSOF ¶ 19.) Because of Plaintiff's falls on April 13 and 14, a telemedicine NP—who did not evaluate Plaintiff in person—recommended that Plaintiff be moved to a lower bunk. (Doc. 15-1 ¶ 12.) Defendant Adams did not agree with this recommendation based on her observations that Plaintiff was able to engage in physical activity while performing his job in the medical unit and Plaintiff reporting to the cardiologist that he was able to exercise in the yard. (*Id.*)

On April 17, 2023, Plaintiff reported falling from his bunk again, and he was sent to the hospital. (Doc. 15-1 ¶ 14.) Plaintiff did not complain of any cardiac symptoms precipitating the fall, but instead indicated that he "fell climbing into his bunk due to a sharp tearing pain in the left groin." (Doc. 15-2 at 84). The treating physicians noted that Plaintiff had a history of inguinal hernia, that Plaintiff had no "chest pain or shortness of breath," and that Plaintiff's cardiac readings were "normal" with "no murmurs, gallops, or rubs." (*Id.* at 84–85). Plaintiff was given another CT scan to check for any spinal injuries and returned to the prison. (*Id.* at 87-98). Plaintiff's CT scan and x-rays were unremarkable. (Doc. 15-1 ¶ 14.) Plaintiff was seen by Defendant Adams after returning from the emergency room, and he denied any lingering pain, and Defendant Adams noted that a bottom bunk assignment was not necessary. (Doc. 15-1 ¶ 14.)

On April 18, 2023, Plaintiff was seen again by NP Forehand, who also noted that there was no medical necessity for a bottom bunk. (*Id.* ¶ 15.) NP Forehand told Plaintiff that security watches may have to be implemented to observe what is happening to cause the falls and to ensure Plaintiff's safety. (DSOF ¶ 23.) Plaintiff said he did not want to be on watch. (*Id.* ¶ 24.) Plaintiff did not report any falls after April 18, 2023. (*Id.*)

Plaintiff asserts that NaphCare and ADC Director Thornell promulgated a policy that requires a 65% heart blockage before a prisoner can be assigned a top bunk or sent to a cardiologist for evaluation and that this policy amounts to deliberate indifference and

- 7 -

caused him to suffer two heart attacks and other injuries when he fell from his top bunk. (Doc. 1 at 10, 11.)

## IV. Eighth Amendment Standard

To prevail on an Eighth Amendment medical claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to this analysis: an objective prong and a subjective prong. First, as to the objective prong, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).

Second, as to the subjective prong, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. To satisfy the knowledge component, the official must both "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. But the deliberate-indifference doctrine is limited; an inadvertent failure to provide adequate medical care or negligence in diagnosing or treating a medical condition does not support an Eighth Amendment claim. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted); *see Estelle*, 429 U.S. at 106 (negligence does not rise to the level of a constitutional violation). Further, a mere difference in medical opinion does not establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *Sanchez v.*

*Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

  Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

  Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

  Additionally, to succeed on his Eighth Amendment claim against Defendant NaphCare and Defendant Thornell in his official capacity, Plaintiff must show that he suffered a constitutional violation because of an official policy or custom. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) (*Monell* requirements apply to private entities sued under § 1983). This requires Plaintiff to show (1) a constitutional deprivation; (2) that the entity had a policy or custom; (3) that the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). Thus, the critical question in the *Monell* analysis is whether the entity's policy or custom inflicted the harm or injury, or if the harm resulted from the independent acts of a subordinate. *See Los Angeles Cnty. v. Humphries*,

1  562 U.S. 29, 36 (2010).

## V. Discussion

The parties do not dispute, and the record makes clear, that Plaintiff's heart condition satisfies the objective prong of the deliberate indifference analysis. The undisputed facts show that Plaintiff's heart condition was "worthy of comment or treatment[,]" including repeat EKG evaluations and a cardiology consultation. *See McGuckin*, 974 F.2d at 1059-60. The Court must therefore move on to the subjective prong and determine whether Defendants' responses to Plaintiff's serious medical needs amounted to deliberate indifference. *See Jett*, 439 F.3d at 1096.

The record does not support Plaintiff's claim that Defendants Adams and Stewart, or any other medical staff at the prison, denied him treatment for his heart condition. Defendants have presented medical records—which Plaintiff has not refuted—indicating that the medical staff has been responsive to Plaintiff's serious medical need. Plaintiff underwent repeat EKGs, and when the results indicated an abnormal heartbeat, he was sent for a cardiology consultation. The cardiologist determined that Plaintiff had no cardiac risk factors or any other cardiac symptoms besides the abnormal EKG, the RBBB pattern was probably congenital and not a significant risk, and no further cardiac work-up was necessary. Although the telemedicine provider recommended a lower bunk SNO—without examining Plaintiff—Plaintiff's treating providers did not observe any medical indication that a lower bunk SNO was medically necessary based on their observations and Plaintiff's reports that he was able to exercise and perform his job duties without assistance.

Construing in Plaintiff's favor that he fell from his top bunk at least three times, there is no evidence that these falls were the result of any cardiac symptoms, and contrary to Plaintiff's assertion, the hospital records do not indicate that Plaintiff suffered a heart attack prior to any of these falls. After Plaintiff's April 17, 2023, fall, NP Forehand suggested placing Plaintiff on watch to figure out why he was falling, to which Plaintiff objected, and there is no evidence that Plaintiff fell from his top bunk again after that date. Moreover, even if Plaintiff received delayed responses to his HNRs, for this to amount to

a constitutional violation, it must have caused Plaintiff harm, and the record does not show that Plaintiff was harmed because of the delays between filing HNRs and being seen by a provider. *Jett*, 439 F.3d at 1096; *Hunt*, 865 F.2d at 200.

Plaintiff's disagreement with his treating providers' decisions regarding his SNO, absent evidence that their treatment decisions were medically inappropriate, is insufficient to support an Eighth Amendment claim. The available evidence does not support a finding that Defendants deliberately disregarded Plaintiff's heart condition, particularly where the cardiologist determined that his condition was not serious and did not require additional follow up.

Accordingly, summary judgment will be granted as to Plaintiff's claims against Defendants Adams and Stewart. Because the record does not support a constitutional violation, Plaintiff's claims against Defendants NaphCare and Thornell in his official capacity must also be dismissed.

**IT IS ORDERED** that the reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 57), and the Motion is **granted**. The action is terminated with prejudice, and the Clerk of Court must enter judgment accordingly.

Dated this 3rd day of June 2024.

Michael T. Liburdi
United States District Judge